YOUNG v. TRUSTEES OF FOUNTAIN INN GRADED SCHOOL.

FREE PUBLIC SCHOOLS—INCIDENTAL FEES.—THE TRUSTEES of a graded
school run under the general free school law of 1896 (*22* Stat., 150,)
have no authority to charge the pupils incidental fees.

Proceedings for injunction in the original jurisdiction of
this Court by J. R. Young, H. J. Watson and J. T. Wood,
on behalf of themselves and other taxpayers of Fountain Inn
Graded School, against Dr. H. L. Shaw, J. J. Hitch and J. P.
Kellett, as trustees of Fountain Inn Graded School.

*Mr. J. J. McSwain,* for petitioner (oral argument).

*Messrs. Carey & McCullough,* contra (oral argument).

May 6, 1902.   The opinion of the Court was delivered by

MR. JUSTICE POPE.   This is a proceeding in the original
jurisdiction of the Supreme Court, by which the petitioners
seek a perpetual injunction against the respondents, as trus-
tees of the Fountain Inn Graded School, preventing the latter
from enforcing a resolution of said trustees for the payment
of $2 by every scholar who shall attend said graded school
during each year, to be paid on or before 1st December of
each year, under a penalty if the payment of such $2 be re-
fused or neglected, that the child or children who shall so re-
fuse shall be denied the right to attend such graded school,
unless an affidavit shall be made that such child or children
so neglecting or refusing to pay the said two dollars, has or
have not the means with which to pay the same.   This Court
is relieved of all care as to the facts out of which the conten-
tion has arisen by reason of the following agreed statement
of facts:

"1. That the petitioners are resident citizens and taxpay-
ers within the Fountain Inn Graded School District, which
graded school district is within the State aforesaid, partly
lying in Greenville County and partly lying in Laurens

County, the larger portion, however, being in Greenville County.

"2. That the respondents are the legally constituted board of trustees for the said Fountain Inn Graded School District, and were such at the times hereinafter mentioned.

"3. That the term of the said graded school for this session began on the 9th day of September, 1901, and was comtemplated to run nine school months from that date.

"4. That the following constitutes the corps of teachers for the said school, to wit: a principal and three regular assistants. There are two other assistants incidentally connected with the school. The principal and three regular assistants being paid out of the school fund.

"5. The said school is supported from the following sources, to wit: (1) A tax of four mills which is levied upon the taxable property within the district as authorized by law. (2) By its *pro rata* of the ordinary school fund, as provided for by the Constitution and laws of the State of South Carolina. These funds are no more than sufficient to pay the corps of teachers, if sufficient for that purpose; that, judging from past experience, it is doubtful whether or not this fund will be sufficient to pay the teachers, and to pay the indebtedness of the school district to the general school fund. For previous years the said school district has not had income enough from these sources to pay the corps of teachers, and has been overdrawing from the general fund by permission and consent of the proper authorities for that purpose. This statement applies to the conditions heretofore when only three teachers were employed for the school, but this year it was necessary to employ an additional teacher, and consequently entail a greater expense. Respondents hope and expect, however, to realize enough from the above sources this year to pay in full the salary of the teachers.

"6. That the said school district owns a school building within which the said school is taught, which building had three rooms, each 22x30 feet and a rostrum 12x22 feet; that these rooms were insufficient to accommodate the pupils and

the additional teacher which had to be employed, and it was absolutely necessary 'for the benefit of the school district to enlarge the building, which was done by adding 22x18 feet to the said rostrum, thereby making it a room of the same size as the others; that it cost to do this $129.50, which amount could not be used from the general fund without impairing the efficiency of the school service; that in addition to this it was necessary to purchase twenty seats for the purposes of the school, which cost $50, and also it was necessary to have the school building heated during the fall and winter months; and also certain other incidental expenses will have to be met from time to time, such as keeping the building in proper repair, etc. That in order to meet these incidental expenses, it became necessary, in the judgment of the board of trustees, to the proper conduct and management of the said school to impose an incidental fee upon those who were able to pay it, and the said board of trustees, before the beginning of the present session, passed a resolution requiring of each pupil, except those whose parents would make an affidavit that they were unable to pay the same, an incidental fee of $2, in order to meet the incidental expenses incident to said school, and to assist in defraying the other extra expenses hereinbefore mentioned, without which the efficiency of the school would be greatly impaired; that before taking this action the board of trustees consulted with many, if not the majority, of the patrons of the school, and the said proposed action met with their hearty concurrence, and subsequently the said patrons filed a written indorsement of the action of the said board of trustees, which indorsement is hereto attached and made a part of this agreed statement of facts. Some of the names appearing upon this indorsement are not patrons of this school, but they are all taxpayers living within the district. That there were last year 129 polls within the district, including white and colored; that there are about 61 patrons of the said school district, and of this number 45 have signed the written indorsement of the action of the trustees in requiring the said incidental fee.

Of this number all have paid the said incidental fee or are willing to pay, except *1*, who is a beneficiary, by reason of his inability to pay. According to the best estimate that can now be obtained, there are only *16* patrons, or those contemplating patronizing the school, that are unwilling to pay the said incidental fee.

"8. That your petitioners are resident citizens and taxpayers within the said district; that the petitioner, J. R. Young, sends three children, two girls and a boy; that he has paid the incidental fee as to the two girls but has not paid for the boy. Your petitioner, H. J. Watson, intended sending one or more pupils, but is unwilling to pay the incidental fee unless the Court sustains the action of the trustees in charging the said fee. Your petitioner, J. T. Wood, contemplates entering one child, but the said trustees require of him the payment of the said $2 incidental fee, in accordance with their resolution.

"9. That the said board of trustees have also passed a resolution to the effect that all those pupils who have not paid the incidental fee on or by December 1, 1901, be suspended and prevented from further attending the said Fountain Inn Graded School.

"10. That your petitioners are able to pay the $2 incidental fee, but are advised that under the school law the said trustees have no right to charge the said incidental fee, and are unwilling to pay the same unless it is established by the proper authorities that the said board of trustees have the right to charge the said incidental fee.

"11. The said board of trustees are advised that they have the legal right to charge the said incidental fee, but, recognizing that they are officers of the public, do not desire to insist upon their action unless they have the legal right so to do; that it was necessary to the best interest of the school district to charge the incidental fee, and if the same is not allowed, the result will be that the free term will have to be shortened, which will be, in the opinion of the board of trustees, detrimental to the best interests of the district."

The main question, if not the only question, is, "Have the provisions of the act of 1896, entitled 'An act to declare the free school law of the State' (22 Stat. at Large, p. 150), conferred authority upon the trustees of the school district to enforce by resolution the payment of incidental fees by scholars in such school upon the pain, in case of failure, of expulsion from school?" The cases of *Hollen* v. *Rock Hill School District* and *Rowell* v. *McLendon, Treas. of Florence County,* 60 S. C., pp. 41-48, inclusive, do not affect the question; for in both of those cases, the special statute had authorized the collection of incidental fees by the school trustees. This is admitted by the respondents. But it is claimed that this power of the trustees may be inferred from the language of the act of 1896, at sections 32, 37, 44, which are as follows:

"Sec. 32. Each school district shall be under the management and control of the board of trustees hereinafter provided for, subject to the supervision of the county board of education.

"Sec. 37. The board of trustees in each school district shall take the management and control of the local educational interests of the same, and shall visit each school district at least once in every school term, and shall be subject to the supervision and orders of the county board of education.

"Sec. 44. The board of trustees shall also have authority, and it shall be their duty: 1st. To provide suitable school houses in their district, and to make the same comfortable, paying due regard to any school house already built or site procured, as well as to all other circumstances proper to be considered so as best to promote the educational interests of their districts. 2d. To employ teachers from those having certificates from their county board of examiners or from the State board of education, and fix their salaries, and to discharge the same when good and sufficient reasons for so doing present themselves, subject to the supervision of the county board of education. 3d. To suspend or dismiss pupils when the best interest of the schools make it necessary.

4th. To call meetings of the qualified electors of the district
for consultation in regard to the school interests thereof; at
which meeting the chairman or other members of the board
shall preside, if present.    5th. To take care of, manage and
control the school property of the district.    6th. To visit the
free public schools within their district from time to time,
and to take care that they are conducted according to law
and with the utmost efficiency.    7th. They shall be allowed
to cross all bridges or ferries free of charge when they are
traveling on official business."

The taxpayers within the bounds of the territory of the
Fountain Inn Graded School District have certainly shown
their appreciation of the value of education, for they have
consented not only to pay the constitutional and poll taxes,
but in addition thereto they have consented to pay four mill
taxes for this school.    It is proposed now to assert the right
in these school trustees to require an additional contribution
by each pupil of said school.    It is claimed by the respond-
ents that unless this is paid, such trustees cannot provide
nine months of tuition.    In answer we say, the act of 1896
does not require that the schools shall be kept open for nine
months.    If the trustees have the right, under the act of
1896, to charge an incidental fee of $2 from each scholar,
they have the right to increase it to $10 per scholar.    In
other words, if the right exists, there is no limit in said act
of 1896 to such power of the trustees.    But, as before said:
"Does the act of 1896, by its terms, give the trustees any
power to lay the burden of incidental fees upon the child-
ren?"    The title of the act (of 1896) in question certainly
looks forward to free public schools in this State.    It pro-
vides for the disbursement of taxes to be paid; it allows the
people, in certain specific instances, to have imposed upon
them additional taxes to support the schools.    These sums
of money are to be disbursed by the county treasurer upon
the order of the boards of school trustees, approved by the
county superintendent of education.    By the terms of this
act there is no provision for the district school trustees to

handle any money except in the event some legacy or bequest
is made to a special school district. The proposed incidental
school fees, in the case at bar, will of necessity be handled by
the school trustees of the Fountain Inn Graded School. No
such condition of things is provided for in the act of 1896.
As before remarked, the respondents suggest and insist that
the power to pass and enforce their resolution may be found
in the act of 1896, by the use of the word "control" in said
act. They suggest that the word "control" has been given
a construction by the Court in certain cases of the powers
to regulate, which construction, then given, will justify us in
the case at bar in giving these trustees the power to so regu-
late the affairs of this school as to lay upon the scholars this
burden of paying these incidental fees. For instance, it is
suggested, in *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U.
S., 203, it was held in construing the words of the Federal
Constitution, that "Power to regulate commerce" means:
"Power to regulate commerce is the power to prescribe the
rules by which it shall be governed; that is, the condition
upon which it shall be conducted; to determine when it shall
be free and when subject to duties or other exactions." We
cannot adopt this view. It is true, "regulate" is one of the
meanings of the word "control." In its primary sense the
word "control" imports a check by a counter-check or regis-
ter or duplicate account. Gradually an enlarged meaning
has been given to the word, so that it now means "to exercise
a restraining influence over;" "to check;" "to counteract;"
"to restrain;" "to regulate." However, through this word
"control," it is essential that the idea of check or restraint in
some shade of meaning shall appear. Take, in illustration,
this very act of 1896; in the fifth section these words occur:
"Section 5. * * * The said trustees (of any school district)
are hereby invested with the care and custody of all school
houses or other school property belonging to their school
districts, with full power to control the same in such manner
as they may think will best subserve the interest of the free
public schools and the cause of education." Then "control"

means to check or restrain. Certainly the use of the word "control" in the quotation just made from the fifth section is confined to the care and custody by the school trustees of the school houses or other school property belonging to a school district. There is nothing here that hints at authorizing the school trustees to impose any monetary charges with respect to this property. So, also, in sec. 32, already quoted, the words "management and control" of the school district by the board of trustees, do not import any power beyond that demanded from their ordinary meaning. Sec. 37, already quoted, when the words "management and control of the local educational interests of" the school district occur, have added to them these words, "subject to the supervision and orders of the county board of education," thus showing that the legislation of this State did not intend that the board of trustees should act in the management and control of the local educational interests without the supervision and orders of the county board of education. Certainly the words of this section cannot be said to confer upon this board of trustees any such power as is claimed for it. In the statement of facts there is no allegation that the board of trustees of this school district have received the assent of the county board of education to this proposed $2 incidental fee. Lastly, sec. 44, already quoted, vests the board of trustees with specific duties—to provide suitable school houses, to employ teachers, to suspend or dismiss pupils, to call meetings of the qualified electors of the district, to take care of, manage and control the school property of the district, and so on. Surely the legislature could not have more pointedly fixed the specific duties of a board of trustees of a school district than is here done. And it is equally certain to our minds that the word "control" nowhere in any of these sections of the act of 1896, now being considered, has been given a meaning by the legislature which authorizes this board of trustees to impose the proposed $2 incidental fee. We honor the motives of this body of public-spirited citizens in their effort to advance the education of the children living

within the bounds of their school district, but we dare not add to the law. The injunction as prayed for must be issued.

It is the judgment of this Court, that the order enjoining the respondents from laying upon the students of the Fountain Inn Graded School the proposed incidental fee of $2 be issued.